# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of March, two thousand twenty-three.

PRESENT: Amalya L. Kearse,
Rosemary S. Pooler,
Steven J. Menashi,
  *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

  *Appellee*,

v.   No. 21-2049

MICHAEL MENDLOWITZ, also known as
MOSHE MENDLOWITZ,

  *Defendant-Appellant.*\*

_____

---

\* The Clerk of Court is directed to amend the caption as set forth above.

| | |
|---|---|
| *For Appellee*: | JILAN J. KAMAL, Assistant United States Attorney (David Abramowicz, Dina McLeod, Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY. |
| *For Defendant-Appellant*: | ALEXANDRA A.E. SHAPIRO, Shapiro Arato Bach LLP (Theodore Sampsell-Jones, Alice Buttrick, Shapiro Arato Bach LLP, Patrick J. Smith, Brian Burns, Smith Villazor LLP, *on the brief*), New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgment of the district court is **AFFIRMED**.

Michael "Moshe" Mendlowitz was the President and Chief Executive Officer of a payment processing company called Commerce Payment Systems ("CPS"). While at CPS, Mendlowitz oversaw a sales operation by which CPS agents guaranteed certain fees and rates to merchants, then raised those fees and rates later on, often without advance notice. Mendlowitz's conduct ranged from approving misleading sales scripts for sales agents to withholding Terms and Conditions sheets in contracts with merchants. After an audit from CPS's parent company, EVO Payments, Inc. ("EVO"), Mendlowitz implemented a system that would auto-initial the rest of the Terms and Conditions sheets for merchants after they had signed the first page of an agreement without needing to review the additional pages.

Mendlowitz was convicted of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. He challenges his conviction on four grounds. First, he argues that the district court erred when it did not ask specifically about potential antisemitic bias at jury selection. Second, he claims that the district court erred in excluding his proffered expert witness from testifying. Third, he argues that the district court erred in excluding a recording of Mendlowitz from being played at trial. Fourth, Mendlowitz contends that the district court's cumulative evidentiary errors warrant a new trial. We conclude that the district court did not err in conducting voir dire. We also conclude that even if the district court erred in excluding the expert witness's testimony and the recording, those errors were harmless individually and cumulatively. We assume the parties' familiarity with the underlying facts and procedural history.

# I

Mendlowitz is an Orthodox Jew who wears a yarmulke. In discussions with the district court in advance of voir dire, defense counsel introduced the issue by stating, "my client is Jewish, … he's Orthodox, he wears a yarmulke in court, and he's going to wear it in trial. And that raises the unfortunate specter of bias of prospective jurors." Defense counsel feared that the nature of the charges in this case—an Orthodox Jewish credit-card company executive defrauding small businesses by overcharging them while charging the honest rates to his Jewish friends and family—could inflame antisemitic prejudices. Mendlowitz sought to have the district court ask the following two questions to potential jurors during voir dire:

> [1.] The defendant is Jewish-American. Do you have any personal views towards Jewish people that would cause you to doubt in any way your ability to be a fair and impartial juror in a financial case? …

[2.] Do you have any views on Jewish people in business or related to finance—either positive or negative—that would affect your ability to be a fair and impartial juror?

App'x 111.

The government objected to the questions on the grounds that the questions were not relevant to the allegations or to any defense and that the questions also might suggest the prosecution itself was motivated by antisemitism. The district court instead asked the following question: "Would anything about the physical appearance of Mr. Mendlowitz influence you in this case and/or cause you to doubt in any way your ability to be a fair and impartial juror … in a financial case?" App'x 139. Mendlowitz argues that the replacement of his questions with the district court's question about physical appearance deprived him of his right to a fair and impartial jury. We disagree.

"[J]ury selection falls 'particularly within the province of the trial judge,'" and "[a] trial court's broad discretion in this area includes deciding what questions to ask prospective jurors." *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) (quoting *Skilling v. United States*, 561 U.S. 358, 386 (2010)). "Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) (plurality opinion). Even then, "federal trial judges are not required to ask every question that counsel … believes is appropriate." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002). When the defense requests a certain question, "trial judge[s are] not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by" the defense. *Ham v. South Carolina*, 409 U.S. 524, 527 (1973). The district court was not required to ask about antisemitic prejudices in the exact way that Mendlowitz requested. The district court needed only to "cover the subject."

*Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) (quoting *Aldridge v. United States*, 283 U.S. 308, 311 (1931)).

In *United States v. Nieves*, we reversed a conviction and remanded for a new trial because "the district court abused its discretion by failing to take any of several possible steps that could have effectively screened prospective jurors for [gang-related] bias, or to take other steps to counter any bias that may in fact have existed among the venire." 58 F.4th 623, 626 (2d Cir. 2023). In *Nieves*, "[t]he government's case-in-chief centered largely" on evidence of the defendant's participation in a gang. *Id.* at 627. The defendants had requested that the district court ask certain questions about gang-related bias, and "[t]he parties also suggested that the district court question jurors about a suite of other topics." *Id.* at 628. Yet "[t]he district court instead opted for a far swifter approach than either side had advocated." *Id.* The district court "did not ask—overtly or otherwise—about gang-related bias, notwithstanding that the government's central theory of the case was that the assault was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony." *Id.* at 640. The district court even "deliberately declined to mention that the case concerned gangs at all, or at least to caution the jurors that any feelings they might have about gangs or gang members must be set aside in service of their duty to decide, based on the evidence presented, whether the government established all elements of the charged crimes beyond a reasonable doubt." *Id.* Moreover, the court did not, "as a last resort," even "attempt to counterbalance any of this by asking additional biographical or attitudinal questions that might have circumstantially unearthed inferable bias among potential jurors, permitting either the court to dismiss them for cause, or [the defendant] to exercise his peremptory challenges to the same effect." *Id.*

Because the district court did not "provide *some* opportunity for prospective jurors to be meaningfully screened for biases relevant to [the] particular defendant or the charges against [the] defendant," we held in *Nieves* that the district court "exceeded the bounds of its discretion." *Id.* at 638-40.

In this case, the district court declined to ask Mendlowitz's proposed questions. Instead, the district court asked a question that aimed to achieve the same purpose of probing any potential bias a juror may have. We recognize that a question about a defendant's physical appearance cannot always be used as an adequate substitute to ferret out religious bias. However, here, the district court's question was a reasonable substitute for Mendlowitz's proposed questions. In fact, the question had the desired effect, as evidenced by one juror who responded to the question by stating: "The physical appearance of the defendant, yes, he's wearing a yarmulke and he's supposed to be a student of the Torah. He's not supposed to steal. That is my initial impression." App'x 130. That juror was removed for cause.

*Nieves* concerned the rare case in which a district court failed to take *any* steps to identify a potential bias that was implicated by the government's case. This case does not resemble that one. Mendlowitz has not shown that the district court's decision to substitute its question in place of his proposed questions was an abuse of the trial court's broad discretion in jury selection. We therefore decline to reverse Mendlowitz's conviction on this ground.

## II

Mendlowitz also challenges two of the district court's evidentiary rulings: the district court's exclusion of Mendlowitz's proffered expert witness and the district court's exclusion of a recorded conversation between Mendlowitz and a cooperating government witness who was wearing a wire at the time. Mendlowitz additionally contends that even if neither of these purported errors is itself enough to warrant reversal, the errors taken together cumulatively prejudiced him. Though the district court may have erred in its evidentiary rulings, we conclude that the errors were harmless. The evidence against Mendlowitz was strong enough that, even if the district court had allowed the expert to testify and had admitted the recording, it is exceedingly unlikely that the result would have been different.

## A

Mendlowitz first challenges the district court's exclusion of his proffered expert witness, Patrick Moran, an expert on the practices of the payment-processing industry. Moran planned to testify about the relationship between companies such as CPS and its parent company EVO as well as about the standard practices surrounding pricing, fees, and disclosures in the industry. Mendlowitz argues that the district court's exclusion of Moran's testimony was erroneous.

The district court excluded Moran's testimony for four reasons. First, the district court concluded that Moran's testimony "was not relevant." Special App'x 11. Second, the district court determined that Moran would not provide the jury with "information that was outside of the jury's knowledge." *Id.* Third, the district court took the view that Moran's testimony "was not relevant or connected to Mendlowitz's state of mind." *Id.* Fourth, the district court held that "even if Moran's testimony were relevant and admissible, its relevancy is outweighed by the likelihood of juror confusion." *Id.*

"Evidence is relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also United States v. Litvak*, 889 F.3d 56, 68 (2d Cir. 2018) ("Relevancy is a very low standard.") (internal quotation marks omitted). In general, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Yet "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When a party seeks to introduce expert testimony, the Federal Rules of Evidence provide that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the following four criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Mendlowitz's good faith defense was that he "could have reasonably *believed* CPS was not defrauding anyone simply by following standard industry practices." Appellant's Br. 36. Moran's testimony would have established those standard industry practices. The district court opined that "[t]he mere fact that Mendlowitz was an owner and executive of CPS is insufficient to establish an inference that Mendlowitz was aware of industry practices during the relevant time period." Special App'x 17. However, Mendlowitz notes that his position as a credit card processing company executive would in fact raise a fair inference that he was aware of the standard practices of his own industry.

The district court noted that jurors generally have knowledge about credit cards from participating in the marketplace. Mendlowitz contends that jurors would not necessarily know about the relationships between credit-card processing companies and their subsidiaries as well as standard industry practices with respect to communications between credit-card processing companies and merchants.

The district court observed "that CPS and EVO witnesses—many of whom had either prior experience working for credit card processors or, in the case of [two] EVO employees …, worked with independent sales organizations … like CPS—testified about certain practices in the credit card processing industry." *Id.* at 13-14. For that reason, "there was no need for expert testimony related to industry practice." *Id.* at 15-16. But scattered testimony from government

witnesses who happened to work at other companies was not necessarily a substitute for an expert's testimony about standard industry practices.

The district court was concerned that "Moran had no personal knowledge related to CPS, EVO or Mendlowitz's conduct, thus making his proposed testimony attenuated from what actually occurred at CPS." *Id.* at 17. The district court remarked that "there was a likelihood of jury confusion that the standard against which Mendlowitz's conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute." *Id.* Mendlowitz's defense, however, turned on whether he could have believed his conduct was consistent with industry practice.

## B

Mendlowitz also challenges the district court's exclusion of a recording—made by cooperating witness David Devers—of a conversation between Mendlowitz and Devers. While Devers was wearing a wire, he had a conversation with Mendlowitz about the auto-initialing feature that Mendlowitz implemented for agreements with CPS. The feature would auto-populate a customer's initials on the third through fifth pages of the agreement with CPS after the customer signed the first page. Mendlowitz argues that the district court's exclusion of this recording from the evidence at trial was erroneous.

Mendlowitz and Devers had the following exchange about the auto-initialing feature:

> MENDLOWITZ: Well they are—the thing is when they initial the first page.
> DEVERS: Yeah.
> MENDLOWITZ: It initials everything. Automatically.
> DEVERS: But we can't make it go one by one?
> MENDLOWITZ: We could. You know, it would be a little bit more intrusive.

9

App'x 622. Mendlowitz wanted to admit the recording as evidence that his intent with the auto-initialing program was not to *conceal* the Terms and Conditions pages from the customers but rather to make the signing process easier for them (that is, less "intrusive").[1]

The district court declined to admit the evidence, explaining that it would not be allowed "with this witness," referring to Devers. App'x 343. In a post-trial opinion and order denying Mendlowitz's motion for a new trial under Rule 33, the district court elaborated on its reasoning for excluding the recording. The district court explained that Mendlowitz's statement—that making customers initial every page of the Terms and Conditions "would be a little bit more intrusive"— was "offered for the truth" because Mendlowitz was arguing that the program was implemented for convenience and not to defraud merchants. Special App'x 20-21. Furthermore, the district court noted, "even assuming the statement is admissible, Mendlowitz's argument that his statement demonstrates his state of mind with regard to the terms and conditions is of limited relevance and probative value." *Id.* at 21.

At oral argument on appeal, the government conceded that the recording was not hearsay. *See* Oral Argument Audio Recording at 29:21. The statement in the recording was not offered to prove the truth of the matter asserted—that it would be intrusive to make customers sign every page. Instead, the fact that Mendlowitz would make such a statement was suggestive of his state of mind.

The Federal Rules of Evidence provide that relevant evidence—even evidence of limited relevance—"is admissible." Fed. R. Evid. 402. While the district

---

[1] *See* App'x 342 (Mendlowitz's counsel stating "I think that the theory of the government's case ... is that throughout the indictment period the terms and conditions were withheld through January 2015 for the purpose of advancing the fraud scheme by keeping important information out of the hands of the merchants and that thereafter the terms and conditions were concealed through the auto-population feature. This is counter to that, Judge, a realtime expression of state of mind").

court may "exclude relevant evidence if its probative value is substantially outweighed" by one of the Rule 403 factors, the district court here made no finding that the recording presented "a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"—let alone such a finding that would substantially outweigh the recording's probative value. Fed. R. Evid. 403.

C

Yet "[e]ven if a district court errs, a defendant ordinarily is not entitled to a new trial if those errors were harmless—i.e., unimportant in relation to everything else the jury considered on the issue in question." *United States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022) (internal quotation marks and alteration omitted). Here, we conclude that even if the district court erred, its errors were harmless given the significant evidence against Mendlowitz.

The evidence against Mendlowitz was overwhelming. Mendlowitz approved sales scripts that gave false information to customers. For six years, he also withheld key Terms and Conditions pages from merchant agreements with CPS customers. Those pages related to material aspects of the merchant-customer's agreement, and the terms were often in direct contradiction to the representations that CPS's sales representatives made to potential customers during the sales process. *See* Special App'x 27-28; App'x 183-84, 464-65. The jury heard evidence that when asked about this practice, Mendlowitz told CPS employees that he was worried that providing the omitted Terms and Conditions pages "would kill the deal." App'x 277.

EVO audited CPS, and after the audit found that Mendlowitz was withholding the Terms and Conditions pages, EVO required that CPS include the pages going forward. Even then, Mendlowitz did not simply include the Terms and Conditions pages in the customer agreements. Instead, he implemented a feature for the signing of the agreements that auto-populated customers' initials on the third through fifth pages of the agreement after customers signed the first

page. Throughout this time, CPS kept a list of "platinum" merchants—"usually [Mendlowitz's] friends and family"—who would not be charged the additional fees. App'x 279.

Moran's testimony would not have changed the fact that the evidence demonstrated Mendlowitz's intent to defraud CPS customers. Regardless of the standard industry practices, the evidence indicated that Mendlowitz concealed the Terms and Conditions pages because revealing the terms "would kill the deal." App'x 277. This comment was not the only basis for the conclusion that Mendlowitz acted with fraudulent intent. Testimony indicated that Mendlowitz wanted to "[s]queeze [customers] for as much as possible" during the time between customers signing up with CPS and canceling their accounts, which was not an infrequent occurrence. Supp. App'x 55-56. In addition, CPS incentivized sales agents to mislead customers because the agents could keep sales commissions even if the customers canceled after CPS started charging fees that were undisclosed in the sales process.

The recording of Mendlowitz and Devers also would not have undermined the jury's finding of Mendlowitz's fraudulent intent. The May 2015 recording came months after Mendlowitz implemented the auto-initialing feature in January 2015 and years after he started withholding the Terms and Conditions pages from customers in 2009. The recording does not establish that Mendlowitz's intent was benign. In the recording, Mendlowitz does not indicate that the intrusiveness of signing multiple pages was his actual or only reason for the auto-initialing feature, especially in light of his six years of withholding the Terms and Conditions from CPS customers.

### D

Mendlowitz argues that the district court's evidentiary errors, taken together, cumulatively prejudiced him. We disagree.

In *United States v. Certified Environmental Services*, we found that "evidentiary errors and prosecutorial misconduct[] infected every stage of the

trial" before the district court. 753 F.3d 72, 96 (2d Cir. 2014). However, we "hesitate[d] to vacate and remand [the] case for a new trial based on any one of the errors … in isolation, or perhaps even any one category of those errors. But considering the record as a whole, we [were] compelled to conclude a new trial [was] warranted." *Id.* We decided that the various evidentiary errors, along with the prosecutorial misconduct, worked a "cumulative prejudice" on the defendants. *Id.* at 95. We vacated the defendants' convictions and remanded the case for a new trial. *See id.* at 97.

The facts of *Certified Environmental Services* were particularly egregious, including references by the prosecutor to the potential consequences of the verdict. *See id.* at 95 ("[The defendant] instructed everybody to violate the law. She gathered them. She marshalled them. She still works for [Certified Environmental Services ('CES')]. CES is still in business. Your verdict is going to have consequences, ladies and gentlemen."). The lesson of *Certified Environmental Services* is that in certain cases, when several evidentiary errors combine with various examples of prosecutorial misconduct to render a trial unfair, a new trial is warranted. Here, Mendlowitz does not allege prosecutorial misconduct. The evidentiary errors here, even when taken together, did not cumulatively prejudice Mendlowitz in light of the significant amount of evidence of his guilt.

\*   \*   \*

We have considered Mendlowitz's remaining arguments, which we conclude are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court